# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

RICKEY JOHNSON                          CIVIL ACTION NO. 09-55

VERSUS                                  JUDGE S. MAURICE HICKS, JR.

STATE OF LOUISIANA, ET AL.              MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

This is a civil rights action brought under 42 U.S.C. § 1983 by Rickey Johnson, who

was convicted of the aggravated rape of a woman and incarcerated for 25 years before

being exonerated by post-conviction DNA testing and released.  In his Complaint, Johnson

asserts various Section 1983 violations against former District Attorney James Lynn Davis,

District Attorney Don Burkett, the District Attorney's Office for the 11th Judicial District

(collectively referred to as the "DA Defendants"), the Sabine Parish Sheriff's Office, former

Sheriff James A. Brumley, Sheriff Guffey Pattison, the succession of Deputy John Rainer,

the succession of Deputy Paul Adams (collectively referred to as the "Sheriff's

Defendants") the North Louisiana Criminalistics Laboratory ("Crime Lab") and Crime Lab

Director Pat Wojkiewicz, the State of Louisiana, Chief Indigent Defendant Steven R.

Thomas and the 11th Judicial District Indigent Defender Board,[1] and other unknown

individuals.  See Record Document 1 ("Complaint").  Pending before the Court are four

Motions to Dismiss filed on behalf of Pat Wojkiewicz and the Crime Lab [Record Document

---

[1]On June 18, 2009, Plaintiff's claims against Chief Indigent Defender Steven R. Thomas and the 11th Judicial District Indigent Defender Board were dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because public defenders, when representing their indigent clients, are not considered "state actors" for purposes of § 1983 liability.  See Record Document 14.

22], the DA Defendants [Record Document 24], the State of Louisiana [Record Document 30], and the Sabine Parish Sheriff's Office [Record Document 34].  Having considered the parties' motions, responses, oral arguments,[2] and the applicable law, the Court concludes that the Motions to Dismiss filed on behalf of the State of Louisiana [Record Document 30] and the Sabine Parish Sheriff's Office [Record Document 34] are **GRANTED**, and that the Motions to Dismiss filed on behalf of Pat Wojkiewicz and the Crime Lab [Record Document 22] and the DA Defendants [Record Document 24] are **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND[3]

On July 12, 1982, a twenty-two-year-old woman was raped at her home in the Middle Creek Apartments in Many, Louisiana.  The assailant asked the victim if she was a woman named "Tiny," and stated that he would kill her if she was "Tiny."  The victim repeatedly told the assailant that she was not "Tiny."  The assailant then pointed a gun at her head and threatened to "blow [her] brains out" if she did not stop crying, forced her to take her clothes off, and raped her.  According to the victim, the assailant revealed several details about himself, including: his name (Marcus Johnson), his age (twenty-nine years old), that he was from Leesville, that he had family in Natchitoches and friends in Monroe, that he had been in prison for murder and was currently on parole, and that he had a baby with Tiny.  The assailant asked the victim for money, and at one point tried to sleep with his arm crossed over her chest and his right leg crossed over her legs.  The victim

---

[2]See Record Document 72 [Minutes from Oral Argument].

[3]The events summarized here are drawn from Plaintiff's allegations in the Complaint.  See Record Document 1.

described the assailant as "stocky" with no distinguishing characteristics on his face or body.  After the attack, the assailant asked the victim to give or find him a ride to Natchitoches because he did not have a ride and did not want to catch the bus.

After the attack, the victim called her mother, who notified the Many Police Department.  The victim was taken to Pleasant Hill Hospital where she was examined and a sex crimes kit was collected, including a vaginal swab and vaginal washings.

The morning after her attack, after speaking with police, the victim located Lorraine Brown, known as "Tiny," who had previously lived in the Middle Creek Apartments but moved out of the complex prior to the attack.  Tiny told the victim that she did not know anyone by the name Marcus Johnson, but that she knew a man named Rickey Johnson who was the father of her infant child and lived in Leesville.  The victim gave this information to the police, and deputies were able to obtain a photograph of Rickey Johnson from the Leesville Sheriff's Office.  That afternoon, deputies presented the victim with three photographs.  She identified Rickey Johnson, whose photograph was placed in the middle of the array, as the person who raped her.[4]  Rickey Johnson was subsequently arrested and charged with aggravated rape.

At trial, the State relied primarily on the victim's in-court identification of Johnson as the man who raped her.  The State argued that the victim's identification of Johnson was corroborated by the details the assailant gave during the attack: Johnson lived in Leesville, he had family in Natchitoches, he was on probation (albeit for a misdemeanor, not murder),

---

[4]On July 20, 1982, deputies arranged an in-person lineup that consisted of five individuals, with Rickey Johnson again in the middle position, and the victim identified Johnson as the assailant.  The lineup was later ruled unconstitutional as a violation of Johnson's right to counsel and was excluded from evidence at trial.

and had fathered a child with Tiny.  Other details, however, were not corroborated: Johnson was twenty-six years old at the time of the offense (not twenty-nine), Johnson had an infant child with Tiny and knew where she lived, Johnson had a Thunderbird car (whereas the assailant had no means of transportation), Johnson had never been convicted of a violent crime or served time in prison, Johnson had a small build (not "stocky"), and he had a prominent front tooth covered in dental gold.  The State also introduced the victim's sex crimes kit into evidence and presented expert testimony linking Johnson to the biological evidence.  Pat Wojkiewicz, Director of the North Louisiana Criminalistics Laboratory, testified that blood typing analysis revealed blood type O in the vaginal washing, which indicated that the assailant was a blood type O secreter, and that Johnson was determined to be a blood type O secreter.

On January 7, 1983, the jury convicted Johnson of aggravated rape and, on January 27, 1983, he was sentenced to a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence.

Four months after his conviction, another aggravated rape occurred at the Middle Creek Apartment complex under "strikingly similar" circumstances.[5]  John McNeal was convicted and sentenced to life imprisonment for that offense.  The fact of and evidence pertaining to this second rape were never revealed to Johnson or his defense attorney during the pendency of his criminal appeal.

After exhausting all forms of appeal and habeas relief, Johnson contacted The Innocence Project in New York.  On August 29, 2007, The Innocence Project, with the

---

[5]See Complaint, ¶¶ 43-53, 71, 75-78.

consent and cooperation of District Attorney Don Burkett, filed a Joint Application to obtain the victim's rape kit from the Sabine Parish Clerk of Court for DNA testing pursuant to Louisiana's post-conviction DNA statute, Article 926.1 of the Louisiana Code of Criminal Procedure.  A Sabine Parish judge signed the proposed consent order, and the crime scene evidence was submitted to ReliaGene Laboratory in New Orleans, Louisiana.  The DNA testing results of the sperm portion of the vaginal swab were consistent with a single male donor, with an eleven-marker profile that could be compared to known samples. After a sample was collected from Johnson, ReliaGene performed DNA testing on the sample and compared to the genetic profile from the sperm portion of the victim's vaginal swab.  In a report issued December 21, 2007, DNA testing conclusively excluded Johnson as the donor of the sperm in the victim's vaginal vault.  The DNA profile from the victim's rape kit was then compared to profiles in the Louisiana DNA Database and found to match the profile of John McNeal, the perpetrator of the second rape at the Middle Creek Apartment complex.  On January 14, 2008, the 11th Judicial District Court for the State of Louisiana vacated Johnson's conviction on grounds of actual innocence and he was released after twenty-five years imprisonment.

Pursuant to Louisiana Revised Statute 15:572.8, Johnson attempted to secure adequate compensation from the State of Louisiana.  During the 2008 session of the Louisiana Legislature, a bill was passed that resulted in a payment to Johnson of $150,000.00.[6]

---

[6]Pursuant to La. R.S. 15:572.8, a petitioner who has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted is entitled to compensation, calculated at a rate of $15,000.00 per year incarcerated not to exceed a maximum total amount of

Claiming the amount of compensation provided to him by the State of Louisiana is "woefully inadequate," Johnson filed a Complaint in the Western District of Louisiana seeking compensation for the twenty-five years of his life spent wrongfully imprisoned and resulting damages, and recompense for violations of his First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution.[7]

Specifically, as relevant to the present Motions to Dismiss, Johnson asserts that the District Attorney's Office and Sabine Parish Sheriff's Deputies failed to disclose exculpatory evidence, that the failure to disclose exculpatory evidence resulted from deliberate indifference and from the policies and procedures of defendants, that the investigation of the July 12, 1982 rape was woefully inadequate, and that the Sabine Parish Sheriff's Departments and its officers, agents, and employees intentionally exposed Johnson to the risk of a faulty identification through the lineups in violation of his constitutional rights.  See Complaint ¶¶ 68-83, 90-92.   Johnson also asserts that Wojkiewicz is liable in his supervisory capacity because the blood testing offered into evidence was misleading, incorrect, inconclusive, or otherwise defective.  In addition, Johnson asserts pendant state

_____

$150,000.00.

[7]Johnson asserts his claims under Title 18, United States Code, Section 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

law claims against Defendants based on his "wrongful prosecution, unfair trial, conviction and confinement." Id. at ¶¶ 98-110.

Each movant argues that Johnson's claims should be dismissed for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).  In addition, the DA Defendants, the Crime Lab, and Wojkiewicz assert affirmative defenses of absolute and qualified immunity [Record Documents 22, 24], and the State of Louisiana relies upon Eleventh Amendment immunity and principles of *res judicata*. [Record Document 30].

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss,[8] the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true.  Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir. 2002). Although the complaint need not contain detailed factual allegations to survive dismissal, "the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007), citing Bell Atl. Corp. v. Twombly, 550 U.S. 544,  127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. However, if the allegations set forth in the complaint, even if true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558,

---

[8]Under Rule 12(b)(6), a court may dismiss an action "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

127 S.Ct. at 1967 (quoting 5 Wright & Miller § 1216, at 233-34) (quoting <u>Daves v. Hawaiian</u> <u>Dredging Co.</u>, 114 F.Supp. 643, 645 (D.Hawaíí 1953) (internal quotations omitted).

<b>DISCUSSION</b>

**A.    Sabine Parish Sheriff's Department**

Johnson's Complaint names James A. Brumley (former Sheriff of Sabine Parish), Guffey Pattison (current Sheriff of Sabine Parish), the "Sabine Parish Sheriff's Office," and John Rainer (deputy sheriff) as defendants in this litigation.  Sheriff Pattison contends the "Sabine Parish Sheriff's Office " is not a legal entity that may sue or be sued in its own name and seeks dismissal of Johnson's claims as to the Sabine Parish Sheriff's Office. [Record Document 34].

Johnson concedes that, under Louisiana law,[9] it is the elected Sheriff, not the Parish Sheriff's Office or Sheriff's Department that is the constitutionally designated chief law enforcement officer of the Parish.  Louisiana law affords no legal status to the "Parish Sheriff's Office" so that the department can sue or be sued; such status is reserved for the Sheriff in his official capacity.  <u>Valentine v. Bonneville Ins. Co.</u>, 691 So.2d 665, 668 (La. 1997); <u>see</u> <u>also</u>, <u>Cozzo v. Tangipahoa Parish Council</u>, 279 F.3d 273, 283 (5th Cir. 2002) (recognizing that while a sheriff's office is not a legal entity capable of being sued, the Sheriff is amenable to suit in his official capacity); <u>Whittington v. Maxwell</u>, 2009 WL 3676990, *3 (W.D.La. Nov. 4, 2009) (parish sheriff's departments are not "persons" capable of being sued); <u>Porche v. St. Tammany Parish Sheriff's Office</u>, 67 F.Supp.2d 631, 635 (E.D.La. 1999) ("The law of Louisiana affords no legal status to the Parish Sheriff's

---

[9]Under Rule 17(b)(3) of the Federal Rules of Civil Procedure, a district court must apply the state law to determine the sheriff's office capacity to sue or be sued.

Department wherein said department can sue or be sued, such status being reserved for the Sheriff, individually.") (internal quotation and citation omitted).  Consequently, Sheriff Pattison's Motion to Dismiss shall be GRANTED and Johnson's claims against the "Sabine Parish Sheriff's Office" dismissed with prejudice.   Johnson's claims against Sheriff Pattison, former Sheriff Brumley, and Deputy Rainer shall remain.

## B.   State of Louisiana

The State of Louisiana moves for dismissal alleging it is immune from suit under the Eleventh Amendment, that the complaint fails to state a claim upon which relief may be granted, and that, because Johnson recovered $150,000 pursuant to La. R.S. 15:572.8, Johnson's claims against it are barred by principles of *res judicata*.  [Record Document 30]. As discussed below, the Court need only address the merits of the State of Louisiana's Eleventh Amendment argument.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI.

Although the text of the Amendment appears to restrict only the Article III diversity jurisdiction of the federal courts, the Supreme Court has long "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition...which it confirms." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996) (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 1581, 115 L.Ed.2d 686 (1991)); see also, Alden v. Maine, 527 U.S. 706, 729,

119 S.Ct. 2240, 2254, 144 L.Ed.2d 636 (1999) ("The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone, but by the fundamental postulates implicit in the constitutional design").   That presupposition has two parts: first, each State is a sovereign entity in our federal system; second, "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."   Id. (quoting Hans v. Louisiana, 134 U.S. 1, 13, 10 S.Ct. 504, 506, 33 L.Ed. 842 (1890)).   "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."   Bd. of Trustees of Univ. of Alabama v. Garrett, 541 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) (citing Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000)).   It exists not only to "prevent federal-court judgments that must be paid out of a State's treasury," Seminole Tribe, 517 U.S. at 58, 116 S.Ct. at 1124 (quoting Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994)), but also serves to avoid "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."   Id. (quoting Puerto Rico Aqueduct & Sewer Auth., 506 U.S. 139, 146, 113 S.Ct. 685, 689, 121 L.Ed.2d 605 (1993)).   Claims under 42 U.S.C. § 1983 do not override the Eleventh Amendment bar. Briggs v. Mississippi, 331 F.3d 499, 503 (5th Cir. 2003).

Johnson concedes that "maintaining the claim for money damages against the State would require a change in the law." [Record Document 44, p.24].   However, Johnson fails to allege or state any basis for a change in the existing law, a change that would undoubtedly overturn more than a century's-worth of precedence.   Despite this concession,

Johnson urges the Court to "maintain the State as a defendant with respect to the pendant state claims." Id.  As a general rule, state claims should be dismissed when the federal claims to which they are pendent are dismissed.  Parker v. Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 585 (5th Cir. 1992).  Because there has not been a "substantial commitment of judicial resources to the nonfederal claims" in this matter, the Court finds no reason to continue to exercise jurisdiction over the pendent state claims.

Accordingly, recognizing that the Eleventh Amendment bars this Court from exercising jurisdiction over Johnson's claims against the State of Louisiana, the State's motion to dismiss shall be GRANTED and Johnson's claims against the State shall be dismissed with prejudice.

## C.    DA Defendants

Johnson's Complaint names former District Attorney James Lynn Davis, current District Attorney Don Burkett, and the District Attorney's Office for the 11th Judicial District as defendants (collectively referred to as the "DA Defendants").  Johnson is suing Davis in his individual capacity as well as his official capacity, because at all relevant times, "he was a final policymaker responsible for his own actions and the actions of his subordinate employees of the 11th Judicial District Attorney's Office, and was acting in an administrative capacity with respect to certain matters alleged" in the Complaint.  See Record Document 1, ¶ 8.  Johnson is suing Burkett solely in his official capacity "as the successor in office and liability to District Attorney Davis. . . ."  Id. at ¶ 9.  The DA Defendants seek dismissal of Johnson's claims against them in their entirety on the following grounds: (1) any claims based on alleged constitutional violations occurring more than one year prior to the filing of this suit  are barred by Louisiana's one-year prescriptive

period; (2) the Complaint fails to state a claim against District Attorney Davis in his individual capacity;  (3) any claim against District Attorney Burkett and former District Attorney Davis in their official capacity is barred by the Eleventh Amendment; and (4) the Monell claim asserted by Johnson is barred by the Supreme Court's decision in Van de Kamp v. Goldstein, – U.S. –, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009).  [Record Documents 24, 59, 65, 70].  The DA Defendants also seek dismissal of all pendant state law claims.  [Record Document 24].   The Court will address each of these arguments separately.

      1.    **Prescription of Johnson's Claims**

In Heck v. Humphrey, 512 U.S. 477, 486, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994), the United States Supreme Court held that a Section 1983 plaintiff seeking to recover damages for an allegedly unconstitutional or unlawful conviction, or for some other harm that would render a conviction invalid, must prove that the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Id., 512 U.S. at 486-87, 114 S.Ct. at 2372.  Thus, when a plaintiff seeks damages under Section 1983,

> the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

Id., 512 U.S. at 487, 114 S.Ct. at 2372-73 (emphasis in original).  In other words, district

courts should refrain from hearing civil tort suits that may cast doubt on a criminal

conviction.  But when no conflict exists between the conviction and the plaintiff's civil

claims, the Section 1983 suit should be allowed to proceed.  See Thompson v. Connick,

2005 WL 3541035, *2 (E.D.La. 2005), aff'd, 553 F.3d 836 (5th Cir. 2008) ("Thompson I"),

decision on en banc reh'g, 578 F.3d 293 (5th Cir. 2009) ("Thompson II"), petition for cert.

filed.

The DA Defendants assert that any alleged constitutional violations occurring more

than one year prior to the filing of this suit are barred by Louisiana's one-year prescription

period for delictual actions.  See Record Document 59, p.7; La. C.C. Art. 3492.

Specifically, the DA Defendants point to Johnson's claims that certain evidence was not

presented to the grand jury and for the alleged acts leading to an unconstitutional lineup.[10]

---

[10]With respect to the alleged unconstitutional photo lineup, Johnson does not allege any facts or otherwise state any claim against the DA Defendants for this alleged constitutional violation.  Rather, Johnson merely claims the "Sabine Parish Sheriff's Department and its officers, agents and employees" are liable for the faulty lineup which resulted in a denial of his "constitutional rights, his conviction, his imprisonment, and his damages."  See Record Document 1, ¶ 79-83.

The Sabine Parish Sheriff's Office defendants ("Sheriff's Defendants") have not raised the timeliness of Johnson's claims concerning the alleged unconstitutional photo lineup, but the Court notes that this is not the sort of constitutional violation that "necessarily" implies the invalidity of a criminal conviction.  Even if the Court were to determine in this suit that the Sheriff's Defendants violated Johnson's constitutional rights—by failing to include "filler photos that more closely resembled the initial description of the assailant by the victim, by deliberately or indifferently conducting the lineup without notifying defense counsel, and by failing to adhere to the best practices for lineups, thus intentionally exposing Johnson to the risk of a faulty identification"— Johnson's conviction would not necessarily be based upon the alleged misconduct of the Sheriff's Defendants, especially considering the victim's in-court identification of Johnson as the assailant.  See Clay v. Allen, 242 F.3d 679, 682 (5th Cir. 2001) (a finding by the district court in a Section 1983 suit that Johnson's constitutional rights

Id.; see also, Record Document 70, p.2.  Johnson argues his claims could not have been brought pursuant to Section 1983 because his conviction was not vacated until January 14, 2008.[11]

The heart of Johnson's claim against the DA Defendants is that the prosecution failed to disclose exculpatory material to Johnson or his defense attorney during the pendency of the criminal prosecution.  See Record Document 1, ¶ 68-78.  Had Johnson filed a civil suit pursuant to Section 1983 alleging constitutional violations such as failure to disclose exculpatory evidence and failure to investigate before his conviction was overturned in 2008, he would have been necessarily implying, by way of a civil suit, that his aggravated rape conviction was invalid.  See e.g., Thompson v. Connick, 553 F.3d 836 (5th Cir. 2008) ("Thompson I"), decision on en banc reh'g, 578 F.3d 293 (5th Cir. 2009) ("Thompson II"), petition for cert. filed; Bibbins v. City of Baton Rouge, 489 F.Supp.2d 562, 568-69 (M.D. La. 2007).   Consequently, Johnson's Section 1983 suit regarding the constitutional claims against the DA Defendants was not ripe under Heck until January 14, 2008, the day the 11th Judicial District Court for the State of Louisiana vacated Johnson's conviction.

---

had been violated as a result of tampering with trial records, handpicking the jury in the first trial, and setting excessive bail would not likely be based on the alleged misconduct of defendants) (citing Covington v. City of New York, 171 F.3d 117, 123 (2nd Cir. 1999) (holding that even if a criminal defendant succeeded on his Section 1983 suit based on false arrest, it would not necessarily undermine any potential future larceny conviction because independent evidence, aside from the confession arising out of the false arrest, might still convict him)).

[11]Johnson filed suit in this Court almost one year later on January 13, 2009—one day before the prescriptive period expired.  See Record Document 1.

2.      **Absolute Immunity**

Johnson's Section 1983 claims against former District Attorney Davis arise out of the prosecution against Johnson in the years 1982 and 1983 for aggravated rape. Specifically, Johnson alleges "that the District Attorney failed to submit to the grand jury evidence that Rickey Johnson had a prominent gold tooth not observed or mentioned initially by the victim and that Rickey Johnson was a man of slight build, not the 'stocky' man described by the victim," [Complaint ¶ 68]; "that any exculpatory evidence not presented to the grand jury resulted from a violation of Rickey Johnson's clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963)," Id. at ¶ 69; "based upon the DNA evidence exonerating Rickey Johnson and identifying John McNeal as the rapist, . . . there existed exculpatory evidence not disclosed to plaintiff or his attorney during the pendency of the rape prosecution and its appeal," Id. at ¶ 70; that District Attorney Davis "failed to disclose to plaintiff and his attorney that John McNeal had committed a rape in the same apartment  complex under circumstances strikingly similar to those reported by the victim of the rape for which plaintiff was prosecuted," Id. at 71; "that this failure to disclose exculpatory evidence resulted from deliberate indifference and from the policies and procedures of these defendants, all in violation of plaintiff's constitutional rights," Id. at ¶ 73.[12]  In addition, Johnson alleges former District Attorney

---

[12]Johnson also states:

> The allegations made against Former District Attorney James Lynn Davis herein are based upon information and belief related to the circumstances of this case and based upon results of DNA testing that show plaintiff was not the rapist and

Davis "failed to adequately scrutinize the initial rape investigation to discover that only a fanciful, tenuous, and faulty connection existed between the victim's account of her rape and description of Rickey Johnson," Id. at ¶ 90; and that District Attorney Davis "failed to disclose to the defendant, his counsel, and to the Court that the actual rapist of the victim, John McNeal, had raped another woman in the same apartment complex enjoying the same methods of operation and unmistakable 'signature' aspects to the crime of rape," Id. at ¶ 91.  Johnson also asserts state law claims against former District Attorney Davis for wrongful prosecution, wrongful imprisonment, negligent supervision, and failure to train. Id. at ¶ 98-102.  With respect to these alleged violations of both federal and state law, District Attorney Davis contends he is protected by the doctrine of absolute immunity and, therefore, that all claims against him should be dismissed with prejudice.

In Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the United States Supreme Court held that a prosecutor sued in his individual capacity is immune from civil suit for damages under Section 1983 for his actions in initiating and

---

McNeal was the rapist. Under these circumstances, plaintiff alleges on information and belief that there must have been exculpatory evidence that was not provided to the plaintiff and his criminal defense lawyer. Based on information and belief, petitioners alleges that D.A. Davis or his employees knew that a strikingly similar rape, the "second rape", was committed by John McNeal on April 30, 1983 in the same apartment complex as the subject rape, under circumstances that were remarkably similar to the rape charged against plaintiff. Under the circumstances, and on information and belief, plaintiff alleges that this evidence of a similar rape surfaced during the pendency of the criminal trial or appeal filed by Rickey Johnson, and should have been disclosed under applicable statutory and constitutional mandates as exculpatory evidence.

[Complaint ¶ 75].

pursuing a criminal prosecution and presenting the State's case.  Id., 424 U.S. at 431, 96 S.Ct. at 995; see also, Brooks v. George County, 84 F.3d 157, 168 (5th Cir.), cert. denied, 519 U.S. 948, 117 S.Ct. 359, 136 L.Ed.2d 251 (1996) ("Actions which are related to the judicial process fulfill the prosecutor's advocatory function and are considered absolutely immune from suit").  Upon examining the immunity historically accorded prosecutors at common law and the interests behind it, the Supreme Court concluded that "the same considerations of public policy countenance absolute immunity under Section 1983." Id., 424 U.S. at 424, 96 S.Ct. at 992.  Those considerations include a "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties," and lead to the possibility that the prosecutor "would shade his decisions instead of exercising the independence of judgment required by his public trust."[13] Id., 424 U.S. at 423, 96 S.Ct. at 991.  "The public trust of the prosecutor's office would suffer" if the prosecutor were constrained in making prosecutorial  decisions by having to consider "his own potential liability in a suit for damages." Id., 424 U.S. at 424, 96 S.Ct. at 992.  Furthermore, given the frequency with which criminal defendants would file such suits, Id., 424 U.S. at 425, 96 S.Ct. at 992 (a defendant will often transform his resentment at being prosecuted into the ascription of improper and malicious actions to the

---

[13]As Chief Justice Learned Hand explained, a prosecutor's absolute immunity reflects "a balance between the evils."  Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).  It is "thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."  Id.

State's advocate), the prosecutor's "energy and attention would be diverted from the pressing duty of enforcing the criminal law."[14]  Id.

Subsequent cases have confirmed the importance to the judicial process of granting absolute immunity to prosecutors serving as an advocate for the State, and have extended immunity to prosecutors for appearing in court to present evidence in support of a search warrant, see Burns v. Reed, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), and for preparing and filing charging documents, see Kalina v. Fletcher, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).  Prosecutors are not entitled to absolute immunity, however, for giving legal advice to police officers, see Burns, 500 U.S. 478, 111 S.Ct. 1934, for fabricating physical evidence well in advance of indictment, see Buckley v. Fitzsimmons, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), for making false statements to the press, id., or for attesting to the facts recited in an application for an arrest warrant, see Kalina, 522 U.S. 118, 118 S.Ct. 502.  These actions are not "intimately associated with the judicial phase of the criminal process," but instead are administrative or investigative tasks performed by the prosecutor.[15]

---

[14]The Court emphasized that the doctrine of absolute immunity "does not leave the public powerless to deter misconduct or to punish that which occurs."  Imbler, 424 U.S. at 428-29, 96 S.Ct. at 994.  A prosecutor may still be punished criminally for willful deprivations of constitutional rights, see 18 U.S.C. § 242, and may be subjected to professional discipline by an association of his peers.  See ABA Code of Professional Responsibility and ABA Standards.

[15]In determining whether particular actions of a state prosecutor fit within the common-law tradition of absolute immunity, the Supreme Court has applied a "functional approach," Burns, 500 U.S. at 486, 111 S.Ct. at 1939, looking to "the nature of the function performed" rather than "the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 539, 545, 98 L.Ed.2d 555 (1988).

Some tasks that appear purely administrative, because of their close relationship to the judicial phase of the process, will nonetheless be covered by absolute immunity. Recently, in <u>Van de Kamp v. Goldstein</u>, – U.S. –, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009), the petitioner filed a Section 1983 action against the former Los Angeles County district attorney and chief deputy district attorney alleging the prosecution's failure to communicate with defense counsel and disclose potential impeachment evidence resulted from the failure to "adequately train and to supervise the prosecutors who worked for them as well as their failure to establish an information system about informants." <u>Id.</u>, 129 S.Ct. at 859. A unanimous Supreme Court acknowledged that Goldstein was attacking the office's administrative procedures, but nevertheless concluded that the district attorney was entitled to absolute immunity:

> [P]rosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here.  Those claims focus upon a certain kind of administrative obligation–a kind that itself is directly connected with the conduct of trial.  Here, unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim. The administrative obligations at issue here are thus unlike administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like.  Moreover, the types of activities on which Goldstein's claims focus necessarily require legal knowledge and the exercise of related discretion, *e.g.*, in determining what information should be included in the training or the supervision or the information-system management. . .
>
> * * *
>
> Moreover, because better training or supervision might prevent most, if not all, prosecutorial errors at trial, permission to bring such a suit here would grant permission to criminal defendants to bring claims in other similar instances, in effect claiming

> damages for (trial-related) training or supervisory failings.
> Further, given the complexity of the constitutional issues,
> inadequate training and supervision suits could . . . "pose
> substantial danger of liability even to the honest prosecutor."
> Finally, as Imbler pointed out, defending prosecutorial
> decisions, often years after they were made, could impose
> "unique and intolerable burdens upon a prosecutor responsible
> annually for hundreds of indictments and trials."

Id., 129 S.Ct. 861-63 (internal citations omitted).  Thus, absolute immunity applies not only

to a prosecutor's failure to disclose impeachment material, but also to claims that a

Brady or Giglio violation resulted from the district attorney's failure to train, failure to

supervise, and failure to establish an information system.  Id., 129 S.Ct. at 858-59.

Johnson urges this Court to consider the Fifth Circuit's decision in Thompson I[16]

(original appellate decision before King, J., Stewart, J., and Prado, J.), in which the Fifth

Circuit affirmed a district court judgment in the amount of $14 million following a jury

verdict.  The Fifth Circuit held that one prosecutor's alleged act of hiding exculpatory blood

evidence did not prevent the petitioner from establishing a Section 1983 claim against the

Orleans Parish District Attorney's Office based on failure to train.  Id.  Contrary to

Johnson's assertions, however, Thompson I is not binding on this Court. First, the original

appellate opinion was vacated by the grant of rehearing en banc, and the district court's

opinion was then affirmed only "by reason of an equally divided en banc court."  Thompson

II, 578 F.3d at 293.  Second, the decisions of the district court and the original appellate

panel were decided prior to the Supreme Court's ruling in Van de Kamp, which expressly

---

[16]Thompson v. Connick, et al., 553 F.3d 856 (5th Cir. 2008), decision on en banc
reh'g, 578 F.3d 293 (5th Cir. 2009) ("Thompson II"), pet. for cert. filed.

rejected similar claims of failure to train and supervise.  Therefore, this Court is neither bound by nor persuaded by the Fifth Circuit's decision in Thompson I.

The Court now turns to Johnson's claims against former District Attorney Davis in his individual capacity.  These claims can be divided into three categories: (1) failure to adequately investigate the initial rape investigation; (2) failure to disclose exculpatory evidence to the grand jury; and (3) failure to disclose exculpatory evidence to Johnson or his defense counsel during the pendency of post-conviction proceedings and Johnson's criminal appeal.  Johnson's two claims against former District Attorney's Davis for failing to disclose exculpatory evidence, pre-indictment and post-conviction,[17] fall squarely within the ambit of absolute immunity.  A state prosecutor is absolutely immune for his actions in "initiating a prosecution and in presenting the State's case," Imbler, 424 U.S. at 431, 96 S.Ct. at 995, "even where the prosecutor knowingly used perjured testimony, deliberately withheld exculpatory information, or failed to make full disclosure of all facts casting doubt upon the state's testimony."  Prince v. Wallace, 568 F.2d 1176, 1178-79 (5th Cir. 1978); see also, Warney v. Monroe County, 587 F.3d 113 (2nd Cir. 2009) (holding that prosecutors who withheld exculpatory DNA testing results from prisoner, while prisoner's motion to compel DNA testing and his federal habeas petition were pending, were entitled

---

[17]See Warney v. Monroe County, 587 F.3d 113 (2nd Cir. 2009) (holding that absolute immunity extends to prosecutors' actions taken while on direct appeal and post-conviction collateral proceedings); Yarris v. County of Delaware, 465 F.3d 129, 137 (3rd Cir. 2006) (absolute immunity covers prosecutions' actions after the date of conviction while a direct appeal is pending where the prosecutor is personally involved as the state's advocate in adversarial post-conviction proceedings); Moore v. United States, 213 F.3d 705, 708 (D.C. Cir.), cert. denied, 531 U.S. 978, 121 S.Ct. 426, 148 L.Ed.2d 434 (2000) (absolute immunity protects prosecutor for allegedly concealing exculpatory evidence from the grand jury).

to absolute immunity); <u>Yarris v. County of Delaware</u>, 465 F.3d 129, 137 (3rd Cir. 2006) ("It is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity."); <u>Cousin v. Small</u>, 325 F.3d 627, 635 & n.11 (5th Cir.), <u>cert. denied</u>, 540 U.S. 826, 124 S.Ct. 181, 157 L.Ed.2d 48 (2003) ("the suppression of exculpatory evidence is shielded by absolute immunity").

With respect to Johnson's claim for failure to investigate, the Court need not determine whether this action (or inaction) is merely an investigative task, to which absolute immunity does not extend, or whether it is "intimately associated with the judicial phase of the criminal process."  A claim "that the prosecutor failed to investigate is not of constitutional dimension" because "[t]here is no such due process right."  <u>Simmons v. Wainwright</u>, 585 F.2d 95, 96 (5th Cir. 1978) (per curiam); <u>see</u> <u>also</u>, <u>Arney v. Roberts</u>, 9 F.3d 116, 1993 WL 425121, *2 (10th Cir. 1993), <u>cert. denied</u>, 511 U.S. 1055, 114 S.Ct. 1618, 128 L.Ed.2d 345 (1994) ("the charge that a prosecutor has failed to conduct a proper investigation does not state a constitutional claim").  Consequently, former District Attorney Davis is entitled to absolute immunity from liability for all Section 1983 claims against him in his individual capacity.

The judicial safeguards that justify absolute immunity for the Section 1983 claims against former District Attorney Davis in his individual capacity do not apply, however, to the claims against him and District Attorney Burkett in their official capacity.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105-06, 87 L.Ed.2d 114 (1985) (absolute immunity is a personal defense that is unavailable in an official-capacity action); <u>Cady v. Arenac County</u>, 574 F.3d 334, 342 (6th Cir. 2009) (same); <u>Romero v. Boulder</u>

County DA's Office, 87 Fed.Appx. 696, 697-98 (10th Cir. 2004) (affirming dismissal of claims against prosecutor in his individual capacity based on absolute immunity; affirming dismissal of claims against prosecutor in his official capacity on other grounds); Robert v. Abbott, – F.Supp.2d –, 2009 WL 902488, *11-12 (M.D.Ala., Mar. 31,2009) (holding that prosecutor was entitled to absolute immunity for the § 1983 federal claims against him in his individual capacity; claims against prosecutor in his official capacity were dismissed on other grounds).  A suit against a public official in his official capacity "is *not* a suit against the official personally," but is "to be treated as a suit against the entity." Graham, 473 U.S. at 166, 105 S.Ct. at 3105 (emphasis in original); see also, Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 878, 83 L.Ed.2d 464 (1985).  This is because an award of damages against an official in his individual capacity can be executed only against the official's personal assets, while an award of damages against an official in his official capacity can be executed only against the government entity itself.  Id.

Despite the personal defense of absolute immunity being unavailable to former District Attorney Davis and District Attorney Burkett for the claims against them in their official capacity, the DA Defendants contend these claims should nonetheless be dismissed pursuant to the Eleventh Amendment.  [Record Document 24, p.18].  But it is now well-established that Louisiana district attorneys are considered representatives of the state's political subdivisions rather than of the state itself and are not entitled to Eleventh Amendment immunity. Burge v. Parish of St. Tammany, 187 F.3d 452, 466 (5th Cir. 1999) ("The rule in this circuit is that a Louisiana district attorney, sued in his or her official capacity, is a local government official who is not entitled to Eleventh Amendment immunity"); Mairena v. Foti, 816 F.2d 1061, 1064, n.1 (5th Cir. 1987), cert. denied, 484

U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).  The Fifth Circuit has reasoned that, although the Attorney General theoretically may oversee local prosecutors, "the state treasury will in all likelihood be left untouched if damages were to be levied against" the parish district attorney's office.  Hudson v. City of New Orleans, 174 F.3d 677, 683 (5th Cir.), cert. denied, 528 U.S. 1004, 120 S.Ct. 498, 145 L.Ed.2d 385 (1999).   Thus, Johnson's claims against former District Attorney Davis and District Attorney Burkett in their official capacity are not barred by the Eleventh Amendment, but shall be treated solely as claims against the District Attorney's Office for the 11th Judicial District (hereinafter "the District Attorney's Office").[18]  See Burge, 187 F.3d at 466 ("Official capacity suits represent another way of pleading an action against an entity of which an officer is an agent.").

---

[18]During oral arguments, counsel for the DA Defendants suggested the Court rely on a footnote in Esteves v. Brock, 106 F.3d 674, n.8 (5th Cir. 1997), in which the Fifth Circuit noted that a Texas prosecutor was acting as an agent of the State and entitled to Eleventh Amendment immunity.  But the Fifth Circuit has already rejected this opinion, stating:

> Esteves should be viewed as an interpretation of Texas law concerning the role of a district attorney within the framework of state government. [FN1] But this court has held, contrary to Esteves, and based on Louisiana law, that a parish district attorney is not entitled to Eleventh Amendment immunity.  See Hudson v. City of New Orleans, 174 F.3d 677, n.1 (5th Cir. 1999); Burge, 187 F.3d at 466-67. [Plaintiff's] Eleventh Amendment immunity claim thus fails.
>
>> FN1.  Esteves is reconcilable with an earlier Texas case, Crane v. Texas, 766 F.2d 193 (5th Cir. 1985), based on the different function that the district attorney was performing in Crane (setting county policy for the authorization of misdemeanor warrants) as opposed to Esteves (enforcing Texas criminal law by prosecution).  Thus, Texas district attorneys are shielded by Eleventh Amendment immunity for acts performed as state officers in the scope of criminal prosecution, but they are not so shielded when they act with respect to local policies.

Spikes v. Phelps, 131 Fed.Appx. 47, 49 and n.1 (5th Cir. 2005.

3.    **Monell** Claims

In Monell v. Dept. of Social Serv., 436 U.S. 658, 98 S.Ct. 2010, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and local government agencies cannot be held liable for constitutional torts under Section 1983 under a theory of *respondeat superior*, id., 436 U.S. at 691, 98 S.Ct. at 2036, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id., 436 U.S. at 694, 98 S.Ct. at 2037-38.  To succeed on a Monell claim against a local government entity, the plaintiff must establish (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.  McGregory v. City of Jackson, 335 Fed.Appx. 446, 448, 2009 WL 1833958, *2 (5th Cir. 2009), citing Rivera v. Houston Index. Sch. Dist., 349 F.3d 244, 247-49 (5th Cir. 2003).  Locating an official "policy" or "custom" ensures that a local government entity will be held liable only for those deprivations resulting from the decisions of those officials whose acts may fairly be said to be those of the government entity.  Bryan County Comm'rs v. Brown, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

An "official policy" may be established in one of three ways: (1) "when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," Id., 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting); (2) "where no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself," Id., 520 U.S. at 417-18, 117 S.Ct. 1382 (Souter, J., dissenting); and (3) "even where the policymaker

has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the need.'" Id.  520 U.S. at 419, 117 S.Ct. 1382 (Souter, J., dissenting) (quoting City of Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)).  This case appears to fall under the second and third categories because Johnson alleges the actions of the policymaker, former District Attorney Davis,[19] violated his constitutional rights and, also, that the "failure to disclose exculpatory evidence resulted from deliberate indifference and from the policies and procedures" of the District Attorney's Office.  [Complaint, ¶¶ 68-78].

The parties join issue on whether the Supreme Court's holding in Van de Kamp mandates the dismissal of Johnson's complaint insofar as it asserts a Monell claim against the District Attorney's Office.  The District Attorney's Office concedes that the Supreme Court addressed only the individual capacity claims asserted by the plaintiff in Van de Kamp, but argues no distinction should be made and that the Supreme Court's ruling in Van de Kamp mandates dismissal of Johnson's Monell claims.  See Record Document 24. Johnson argues Van de Kamp simply extended the doctrine of absolute immunity to prosecutors performing certain duties in their administrative capacity, compare Imbler, supra, 424 U.S. at 431 n.33 (distinguishing the duties of a prosecutor in his role as an advocate for the State and administrative actions apart from the courtroom), and that there

_____

[19]Louisiana's constitutional and statutory provisions indicate that a district attorney is the independent and final official policymaker for all the administrative and prosecutorial functions of his office.  Burge, 187 F.3d at 469, and statutes cited therein.

is no authority for extending Van de Kamp to Monell claims.  See OA Transcript (Plaintiff's counsel argued that the district court's judgment would have been reversed by the Fifth Circuit in Thompson II if the Supreme Court had directed its holding in Van de Kamp to Monell claims); see also, Thompson II, 578 F.3d 293, 295 (noting that the Supreme Court "has not specifically excluded municipal Section 1983 liability for prosecutorial offices," but neither "has it ruled that they are vulnerable.") (Jones, C.J., dissenting); Burrell v. Atkins, 2009 WL 365662, *1 (W.D.La. February 13, 2009) (denying reconsideration of the DA Defendants' earlier-denied motion for summary judgment, stating that Van de Kamp "is a unanimous reaffirmation only of the principle that individual prosecutors enjoy absolute immunity from § 1983 actions against them in their individual capacities as set forth in Imbler").  Before reaching its decision, the Court finds it necessary to consider those public policies underlying the common law rule of absolute immunity and relied upon by the Supreme Court in Imbler, as well as the public policies underlying municipal liability under Section 1983.

As previously stated herein, the immunity afforded to prosecutors at common law was based on the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."  Imbler, supra, 424 U.S. at 423, 96 S.Ct. at 991.  The Supreme Court held that these same considerations of public policy countenance absolute immunity for prosecutors under Section 1983 rather than qualified immunity.  Id., 424 U.S. at 424-26, 96 S.Ct. at 992-93.  The affording of only a qualified immunity to the prosecutor could have an adverse effect upon the criminal justice system's goal of accurately determining guilt or

innocence, which "requires that both the prosecution and defense have wide discretion in the conduct of the trial and the presentation of evidence."  Id., 424 U.S. at 426, 96 S.Ct at 993.  Not only would the public trust of the prosecutor's office suffer, but the triers of fact would often be denied relevant evidence if prosecutors were constrained in making every decision by their concern of resulting *personal* liability.  Id.  The ultimate fairness of the operation of the criminal justice system itself would be weakened if prosecutors were subjected to *personal* liability under Section 1983.  See id., 424 U.S. at 427, 96 S.Ct. at 993.

The same considerations of public policy do not necessitate immunity for Monell claims against a District Attorney's Office as an entity.[20]  In such cases, the plaintiff is not attacking the individual advocacy decisions made by a prosecutor, or even the administrative decisions of a prosecutor that are intimately connected with his advocacy functions and the trial process.  See Van de Kamp, 129 S.Ct. at 862-63.  Instead, the plaintiff is attacking only the official policies and procedures of the entity itself that cause constitutional injury.  A district attorney cannot be held personally liable for the constitutional injuries caused by these policies and procedures; any damages must be recovered from a liability insurer or from the public funds controlled by the district attorney or his successor-in-interest.  See Burge, 187 F.3d at 470; Hudson, 174 F.3d at 683.

----

[20]The concerns that justify absolute and qualified immunity for government officials are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue.  Owen v. City of Independence, Mo., 445 U.S. 622, 653, n.37, 100 S.Ct. 1398, 1416, n.37, 63 L.Ed.2d 673 (1980) (although imposing personal liability on public official is likely to have an undue chilling effect on the exercise of their decision-making responsibilities, no such pernicious consequences are likely to flow from the possibility of a recovery from public funds).

Unhampered by a concern of unfounded litigation and the threat of personal liability, a district attorney can freely promulgate and implement official policies and procedures without deflecting his energies from his public duties.  See e.g., Hall v. Alabama, 2010 WL 582076 (M.D.Ala. Feb. 18, 2010) (distinguishing between individual and official capacity claims);  White v. Smith, 2009 WL 3335967 (D.Neb. Oct. 14, 2009) (relying on Van de Kamp to dismiss only the individual-capacity claims).

Furthermore, "[t]he central aim of the Civil Rights Act[21] was to provide protection to those persons wronged by the misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Owen v. City of Independence, Mo., 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980) (internal citations and quotations omitted).  By creating an express federal remedy, Congress sought to "enforce provisions of the Fourteenth Amendment against those who carry a badge of authority. . ., whether they act in accordance with their authority or misuse it."  Id., 445 U.S. at 650-51, 100 S.Ct. at 1415 (quoting Monroe v. Pape, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed. 492 (1961)).  It would be "uniquely amiss" if a municipal entity—an essential part of government "to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct"—was permitted to disavow liability for the constitutional injuries it has caused individual citizens to endure.  Id., 455 U.S. at 651, 100 S.Ct. at 1415 (quoting

_____

[21]Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to Section 1983, was enacted shortly after the end of the Civil War "in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers."  Will v. Mich. Dept. of State Police, 491 U.S. 58, 66, 109 S.Ct. 2309, 105 L.Ed.2d 45 (1989) (quoting Felder v. Casey, 487 U.S. 131, 147, 108 S.Ct. 2302, 2311, 101 L.Ed.2d 123 (1988)).

Adickes v. Kress & Co., 398 U.S. 144, 190, 90 S.Ct. 1598, 1620, 26 L.Ed.2d 142 (1970));

Van de Kamp, 129 S.Ct. at 864 (a finding of absolute immunity sometimes "deprives a

plaintiff of compensation he undoubtedly deserves").  Although individual prosecutors may

not be able to disavow all liability for their wrongdoings, as they may be punished criminally

and/or subjected to professional discipline, see supra, n.14, the same does not hold true

for a municipal entity.  Instead, "[a] damages remedy against the offending [entity] is a vital

component of the scheme for vindicating cherished constitutional guarantees," see 42

U.S.C. § 1981 et seq., "and the importance of assuring its efficacy is only accentuated

when the wrongdoer is the institution that has been established to protect the very rights

it has transgressed."  Owen, 445 U.S. at 651, 110 S.Ct. at 1415.  Moreover, the threat that

a municipal entity will be liable for damages to an aggrieved individual should encourage

official policymakers to promulgate and implement internal rules and programs "designed

to minimize the likelihood of unintentional infringements on constitutional rights."  Id., 445

U.S. at 651-52, 110 S.Ct. at 1416.

The Court's conclusion that absolute immunity does not extend to Monell claims is

supported by the exacting requirements a plaintiff must establish in order to recover for a

claim based on the policymaker's failure to take affirmative action:

> [W]hen a plaintiff seeks to impose § 1983 liability on a
> municipality for its failure to train its employees, normal tort
> standards are replaced with heightened standards of
> culpability and causation.  Liability will only attach if the
> municipality was *deliberately indifferent* to the constitutional
> rights of citizens–a showing of negligence or even gross
> negligence will not suffice.  Errors of judgment do not alone
> prove deliberate indifference, nor is such heightened culpability
> established simply by showing that a municipality could have
> ordered more or different training or even misjudged whether
> training was necessary.  Similarly, to satisfy causation, the

> plaintiff must demonstrate that the failure to train was the
> *moving force* behind the constitutional violation–"but for"
> causation is not enough.

Thompson II, 578 F.3d 293, 297-98 (Clement, J., dissenting) (emphasis in original); see

also, City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412

(1989) ("there are limited circumstances in which an allegation of a 'failure to train' can be

the basis for liability under § 1983").  Absent a pattern of similar constitutional deprivations,

a plaintiff will prevail only where the need for training or other affirmative action "is so

obvious, and the inadequacy so likely to result in the violation of constitutional rights, that

the policymakers of the [District Attorney's Office] can reasonably be said to have been

deliberately indifferent to the need."  Canton, 489 U.S. at 390, 109 S.Ct. at 1205.  A need

for training or other affirmative action "is considered sufficiently obvious only where the

deprivation of constitutional rights is a 'highly predictable consequence' of the training

deficiency."[22]   Thompson II, 578 F.3d 293, 298 (Clement, J., dissenting) (citing Bryan

County Comm'rs v. Brown, 520 U.S. 397, 417, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Consequently, few plaintiff's will be able to surpass the heightened pleading standards and

provide sufficient factual allegations that, taken as true, demonstrate a constitutional injury

caused by the deliberate indifference of a municipal entity and its policymakers.

---

[22]Johnson argues that the Fifth Circuit applied a relaxed (but unarticulated) standard in Thompson I, based on public policy considerations, that should be applied in all cases of innocent men who were wrongfully convicted.  See OA Transcript; Record Document 44, p.5 (referred to as "Innocent Man Standard").  No such standard exists.  Tragic though it is when an innocent man is wrongfully convicted, courts must examine the reasonableness of a policymaker's decision to provide training (or the amount of training) should be viewed without the benefit of hindsight.  See Piotrowski v. City of Houston, 237 F.3d 567, 582 (5th Cir.), reh'g en banc denied, 251 F.3d 159, cert. denied, 534 U.S. 820, 122 S.Ct. 53, 151 L.Ed.2d 23 (2001).

Accordingly, the Court finds that District Attorney Davis and District Attorney Burkett are not cloaked with the protection of absolute immunity insofar as Johnson asserts claims against them in their *official* capacity—claims which must be treated as <u>Monell</u> claims against the District Attorney's Office itself.[23]

Having determined that Johnson may proceed past the 12(b)(6) stage and engage in discovery, the Court stresses to the parties that the scope of Johnson's <u>Monell</u> claim is narrow and does not encompass all underlying constitutional violations alleged in the Complaint.  In order to establish an "official policy" under the second category, <u>see</u> <u>supra</u>, Johnson will be permitted to conduct only limited discovery regarding the alleged failure of former District Attorney Davis to disclose exculpatory evidence during the pendency of

---

[23]At this stage of the proceedings, under Rule 12(b)(6), the Court is required to liberally construe the Complaint in favor of the Plaintiff.  <u>Taylor v. Books A Million, Inc.</u>, 296 F.3d 376, 378 (5th Cir. 2002).  The DA Defendants' argue that Johnson has failed to state a claim upon he may be entitled to relief because they are protected by the doctrine of absolutely immunity.  Nevertheless, the DA Defendants are unable to point to a single case from a superior court in which a <u>Monell</u> claim against a District Attorney's Office has been expressly dismissed on the basis of absolute immunity.  To the contrary, the Fifth Circuit has allowed plaintiffs to proceed with such claims and has affirmed judgments in favor of the plaintiff *despite* the defenses of absolute and qualified immunity.  <u>See</u> <u>Burge</u>, 187 F.3d 452 (holding that a district attorney may be held liable in his official capacity); <u>Spikes v. Phelps</u>, 131 Fed.Appx. 47, 48 (5th Cir. 2005) (absolute prosecutorial immunity is "unavailable in an official capacity suit against a Louisiana district attorney"); <u>Thompson I</u>, 553 F.3d 836 and <u>Thompson II</u>, 578 F.3d 293 (affirming $14 million judgment in favor plaintiff on claims against Orleans Parish District Attorney's Office).  The Court acknowledges the tension created by <u>Van de Kamp</u> and the debate as to whether municipal liability under Section 1983 is consistent with the doctrine of absolute immunity, but there is simply no authority from a superior court holding that the doctrine of absolute immunity applies to <u>Monell</u> claims, and the Court declines to speculate as to whether the doctrine of prosecutorial immunity may later be expanded beyond its present scope.  Thus, in the absence of any binding authority to the contrary, the Court will refrain from depriving Johnson of any potential for recovery from the DA Defendants for the incredible injuries he has endured.

the rape prosecution and its appeal.[24]  See Complaint, ¶ 70.  Similarly, in order to establish

an "official policy" under the third category, see supra, Johnson's discovery will be limited

to his allegations that the District Attorney's Office was "deliberately indifferent" to the need

to either recognize or disclose Brady material and failed to promulgate and implement the

policies and procedures necessary to prevent or protect against a violation of a criminal

defendant's constitutional rights.  See OA Transcript.

### 4.      State Law Claims

In addition to his claims under Section 1983, Johnson asserts state law claims

against the DA Defendants for malicious prosecution, intentional infliction of emotional

distress, and failure to train.  [Complaint ¶ 98-102].  However, state courts have uniformly

---

[24]In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.  However, a prosecutor has no duty to disclose exculpatory to the grand jury.  United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Thus, Johnson's allegation that "the District Attorney failed to submit to the grand jury evidence that Rickey Johnson had a prominent gold tooth not observed or mentioned initially by the victim and that Rickey Johnson was a man of slight build, not the 'stocky' man described by the victim" is insufficient to establish a constitutional violation.  See Complaint ¶ 68.

To the extent Johnson's claim of a failure to disclose exculpatory evidence arise from former District Attorney Davis's actions during the post-conviction proceedings and on appeal, Brady is the wrong framework.  See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne, – U.S. –, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (2009) (A criminal defendant proved guilty of an offense after a fair trial does not have the same liberty interests as a free man).  Instead, Johnson must demonstrate that the District Attorney's Office's "procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'"  Osborne, 129 S.Ct. at 2320 (quoting Medina v. California, 505 U.S. 437, 446, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).

followed the reasoning in <u>Imbler</u> and granted absolute immunity to prosecutors acting within the scope of their prosecutorial duties as advocate for the State from state law tort claims arising "as a consequence of conduct intimately associated with the judicial phase of the criminal process." <u>Knapper v. Connick</u>, 681 So.2d. 944, 949 (La. 1996) (prosecutor entitled to absolute immunity from suit for malicious prosecution); <u>Counsel v. Small</u>, 2001 WL 617455, *9 (E.D.La. June 4, 2001) (applying doctrine of absolute immunity to all state law claims asserted by plaintiff). Consequently, the DA Defendants are entitled to absolute immunity from suit on the state law claims asserted against them.

**D.     Pat Wojtkiewicz and the Northwest Louisiana Crime Lab**

Johnson's claims against Pat Wojtkiewicz ("Wojkiewicz") and the Northwest Louisiana Criminalistics Laboratory ("Crime Lab") can be divided into two categories: those arising from the testimony of Wojtkiewicz at trial, and those arising from the policies and procedures of Wojtkiewicz and the Crime Lab regarding the testing of DNA material. <u>See</u> Complaint ¶ 93-95. Wojtkiewicz alleges he is entitled to absolute immunity or, alternatively, qualified immunity for the claims against him arising from his testimony at trial, and that the factual allegations against Wojtkiewicz and the Crime Lab concerning the testing policies and procedures are conclusory and fail to raise a right to relief above the speculative level. [Record Document 22].

In <u>Briscoe v. LaHue</u>, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the Supreme Court extended the doctrine of absolute immunity to official witnesses "who perform a somewhat different function in the trial process [than the prosecutor] but whose participation in bringing the litigation to a just–or possibly unjust–conclusion is equally indispensable." <u>Id.</u>, 460 U.S. at 345-46, 103 S.Ct. at 1121. It is now well-established that

witnesses are entitled to absolute immunity from Section 1983 claims related to their trial testimony, including from claims of allegedly perjurious testimony.[25]  <u>Brown v. Jones</u>, 24 F.3d 238 (5th Cir. 1994) (per curiam) (citing <u>Endow v. Tishomingo County</u>, 962 F.2d 501, 511 (5th Cir. 1992); <u>see also</u>, <u>Mowbray v. Cameron County, Tex.</u>, 274 F.3d 269, 277 (5th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1055, 122 S.Ct. 1912, 152 L.Ed.2d 822 (2002) (joining the majority of circuit courts that have extended absolute immunity  for claims under Section 1983 of conspiracy to commit perjury).

Wojtkiewicz also seeks absolute immunity for his pre-testimonial activities in testing the blood samples during the 1982 rape investigation.  <u>See</u> Record Document 22, p.5.  In <u>Buckley v. Fitzsimmons</u>, 919 F.2d 1230, 1244-45 (7th Cir. 1990), <u>rev'd on other grounds</u>, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d (1993), the Seventh Circuit determined that witnesses are entitled to absolute immunity not only for the presentation of testimony at trial, but also for their pretrial activities, such as evaluating forensic evidence, writing reports, discussing the case with prosecutors, and preparing to testify.  As Judge Easterbrook stated: "It would be a hollow immunity if the aggrieved party could turn around and say, in effect: 'True, your *delivery* of bad testimony is immunized, but preparing to

---

[25]In the wake of <u>Briscoe</u>, courts have extended absolute testimonial immunity to testimony before the grand jury, post-indictment adversarial suppression hearings, and other adversarial criminal proceedings.  <u>See</u>, <u>e.g.</u>, <u>Jones v. Cannon</u>, 174 F.3d 1271, 1286 (11th Cir. 1999) (detectives were absolutely immune from claims based on their grand jury testimony, pretrial depositions, and trial testimony); <u>Holt v. Castaneda</u>, 832 F.2d 123 (9th Cir. 1987), <u>cert. denied</u>, 485 U.S. 979, 108 S.Ct. 1275, 99 L.Ed.2d 486 (1988) (finding "no principled basis" for distinguishing between pretrial proceedings and trial in determining whether absolute immunity should be granted to a government witness);  <u>Kincaid v. Berle</u>, 712 F.2d 1023, 1024 (7th Cir.), <u>cert. denied</u>, 464 U.S. 1018, 104 S.Ct. 551, 78 L.Ed.2d 725 (finding that "the argument for absolute immunity is stronger in the grand jury setting than in the trial setting, because false testimony before the grand jury is less harmful that false testimony at trial").

deliver that testimony is not, so I can litigate the substance of your testimony.'" Buckley, 919 F.2d at 1245 (emphasis in original).  Unfortunately for Wojtkiewicz, the Fifth Circuit has so far declined to expand the concept of absolute testimonial immunity to activities occurring outside the courtroom.   See Keko v. Hingle, 318 F.3d 639, 642 and n.8 (5th Cir.), reh'g en banc denied, 61 Fed.Appx. 123 (2003) (noting the Seventh Circuit's decision in Buckley granting absolute immunity to prosecutors was overturned by the Supreme Court, leaving the status of their comparable decision for the expert witnesses uncertain); see also, Brown v. Miller, 519 F.3d 231, 237 (5th Cir. 2008) (there is no reason a government scientific expert witness should enjoy greater immunity than that afforded to other investigators).  Accordingly, the Court finds that while Wojtkiewicz is entitled to absolute immunity for all claims against him arising from his testimony at trial, that same immunity does not extend to the claims arising out of the Crime Lab's testing of (or failure to test) DNA material prior to trial and during post-conviction proceedings.  See Keko, 318 F.3d 639 (to the extent a witness's pre-testimonial activities are investigative, "his immunity ought to correlate with the merely qualified immunity granted to the police for comparable activities.").

Johnson alleges the blood test evidence offered at trial was "incorrect, misleading, or incomplete, or deceptive, or otherwise defective," and that any such deficiencies or errors in the blood testing "were caused by the deliberate indifference of the officers, agents and employees of the lab and in particular by [Wojtkiewicz]." [Complaint ¶¶ 93-94]. Johnson also asserts the "Crime Lab and its officers, agents and employees intentionally failed to test or recommend subsequent testing of DNA material in specimens originally tested by it before DNA was commonly used as evidence in prosecutions."  Id. at ¶ 95.

Specifically, Johnson claims the Crime Lab "acquired knowledge, over time, that its original blood testing methods were crude, misleading, and ineffective methods of either identifying the perpetrator or excluding the accused of criminal conduct," and that the Crime Lab's "intentional failure to re-test specimens" and its "policy and procedures against re-testing" were "particularly egregious in cases of uncertain identity."  Id.  The Crime Lab argues these allegations are insufficient to establish that an employee acted with subjective deliberate indifference and that the Wojtkiewicz's acts resulted from a policy or custom adopted or maintained with objective deliberate indifference to Johnson's constitutional rights.  See Record Document 22, p.8.

Due process is violated when the government obtains a conviction with testimony and evidence that the government agents know is false, misleading, or otherwise defective.  See Brown, 519 F.3d at 237 ("A false or scientifically inaccurate report is equivalent to any other false evidence created by investigators"); Keko, 318 F.3d at 644 (stating that a witness should not be entitled to absolute immunity if, as alleged, he used "shoddy and unscientific research techniques").  Construing the Complaint as a whole, and recognizing that dismissal is a disfavored remedy at this stage of the proceedings, the Court finds that Johnson has alleged sufficient facts that, if true, may establish that the blood evidence introduced at trial was "incorrect or misleading" or that the Crime Lab was deliberately indifferent to Johnson's (and other defendant's) constitutional rights.  Accordingly, at this early stage of the proceedings, Wojtkiewicz and the Crime Lab are not entitled to dismissal of Johnson's claims against them concerning the testing of DNA material.[26]

_____

[26]At this stage of the proceedings, the Court is limited to determining whether Johnson has alleged facts sufficient to survive a Rule 12(b)(6) dismissal.  Resolution of

**CONCLUSION**

For the foregoing reasons, the Court finds that the Motion to Dismiss filed on behalf of the Sabine Parish Sheriff's Office [Record Document 34] and the Motion to Dismiss filed on behalf of the State of Louisiana [Record Document 30] shall be **GRANTED**, and all claims against these defendants shall be **DISMISSED WITH PREJUDICE.**  The Court also finds that the Motion to Dismiss filed on behalf of former District Attorney James Lynn Davis, current District Attorney Don Burkett, and the District Attorney's Office for the 11th Judicial District [Record Document 24] and the Motion to Dismiss filed on behalf of the North Louisiana Criminalistics Laboratory and Crime Lab Director Pat Wojkiewicz [Record Document 22] shall be **GRANTED in part** and **DENIED in part.**  All claims against former District Attorney Davis in his individual capacity and all claims against Wojkiewicz arising from his testimony at trial shall be **DISMISSED WITH PREJUDICE**; the Monell claims against the DA Defendants and the claims against Wojkiewicz arising from the testing of DNA material shall remain.

An order consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 16th day of March, 2010.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

any factual issues is improper under a 12(b)(6) inquiry.  See Miller v. Nationwide Life Ins. Co., 2008 WL 3086783, *3 (5th Cir. 2008); Cellar v. Texas Employment Com'n, 825 F.2d 930, 939 (5th Cir. 1987).